UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SLEEPMED INCORPORATED,

           Plaintiff,

   v.

PULSE SYSTEMS, INC.

           Defendant.

Case No. _____

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff SleepMed Incorporated ("SleepMed"), by and through its undersigned counsel, files this Verified Complaint for Injunctive Relief and Damages against Defendant Pulse Systems, Inc. ("Pulse"), averring as follow:

### PARTIES

1. SleepMed is a Delaware corporation with a principal place of business at 200 Corporate Place, Suite 5B, Peabody, Massachusetts 01960.

2. SleepMed is the largest private sleep diagnostics provider and the largest ambulatory electroencephalogram ("EEG") provider in the nation. It operates approximately 80,000 laboratory studies and approximately 150,000 home sleep testing studies annually from its facilities located in 32 states and the District of Columbia.

3. Upon information and belief, Defendant Pulse is a Kansas corporation with a principal place of business at 3017 North Cypress, Wichita, KS, 67226.

### JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because there is diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

6.      Furthermore, Pulse has engaged in continuous and systematic contacts with this judicial district because it sells product and services to customers located within this judicial district including SleepMed.

## FACTUAL BACKGROUND

7.      SleepMed is a private sleep diagnostics and ambulatory EEG provider.

8.      Pulse provides software applications for use in the healthcare industry.

9.      Since 2001, SleepMed has used practice management software licensed from Pulse for important administrative functions, including billing, maintenance of patient information, and submitting and tracking charges to and payments received from commercial, government, and individual payers.

### SleepMed's Relationship with PSI

10.     In the late 1990s, SleepMed contracted with Pulse's predecessor company, Professional Support Incorporated ("PSI"), for software technology and support for various functions relative to the healthcare sector.

11.     Because SleepMed was an atypical PSI customer, PSI worked with SleepMed to customize and support SleepMed in the development of a number of working modules for SleepMed users to access and use across its platform in order to make workflow easier and more efficient.  Part of this customization was the use of the PSI staff table to have a single logon to modules owned and maintained by SleepMed (the "Log-On Feature").

## The 2001 Agreement with Pulse

12. In 2001, Pulse acquired PSI.

13. Thereafter, Pulse approached SleepMed about migrating from the PSI platform to the Pulse Pro Practice Management Platform ("PPPMP").

14. Because SleepMed is not a physician office, it is not a typical customer for PPPMP.

15. As a result, custom modules needed to be created by Pulse and SleepMed to meet SleepMed's specific needs, including the Log-On Feature.

16. PPPMP was physically installed on the machines in SleepMed's Peabody, Massachusetts office (the "Peabody Office").

17. SleepMed needed the custom-developed modules and other applications not related to PPPMP to be accessible from its remote offices.  Pulse recommended Citrix be used for remote access and worked with SleepMed to set up a Citrix environment.

18. On or around June 4, 2001, Pulse and SleepMed entered into an Information System Agreement which reflects SleepMed's use of the customized version of PPPMP (the "2001 Agreement"). A true and correct copy of the 2001 Agreement is attached hereto as Exhibit A.

19. The 2001 Agreement created a license model whereby SleepMed was charged for fees by the number of database and work station licenses.

20. Pulse invoiced SleepMed for the number of database and workstations installed with PPPMP at 50 licenses. At the time, SleepMed had 334 employees.

21. In 2009 Pulse conducted an audit of SleepMed and required SleepMed to purchase four (4) additional licenses based on its then-current usage calculated by the "high

water" mark of installed work stations (*i.e.* 54 work stations). SleepMed had approximately 600 user accounts at the time.

### 2010 Sale of Pulse

22. In 2010, Cegedim, a French company, purchased Pulse.

### 2012 Agreement

23. In 2011, SleepMed desired to license an electronic health record system from Pulse.

24. SleepMed requested a simple addendum to the 2001 Agreement but Pulse wanted to use its then-current license template. Pulse assured SleepMed that the economic terms of the 2001 Agreement would be preserved in the new license and SleepMed materially relied on this representation.

25. The Parties executed an Information System Agreement on or about February 27, 2012 (the "2012 Agreement"), a true copy of which is attached hereto as Exhibit B.

### The 2014 Invoice

26. In 2014, without notice, warning, or discussion, Pulse submitted an invoice to SleepMed for $2,425,219 (the "2014 Invoice") for alleged underpayments dating back to 2001. These alleged underpayments were inconsistent with the parties' agreements and course of dealing over the prior fifteen years, and were not based on an audit.

27. The 2014 Invoice seeks payment based on the number of log-ons through the Log-On Feature without any evidence that SleepMed actually used the PPMP program. Most SleepMed employees use the Log-On Feature simply to access other SleepMed applications, and do not actually use PPPMP.

28. The 2014 Invoice is inconsistent with the fifteen year course of conduct between the Parties, whereby SleepMed was invoiced for the number of work stations installed with PPPMP, not for the number of long-ons.

29. The 2014 Invoice is also inconsistent with Pulse's representations to SleepMed in connection with the 2012 Agreement that SleepMed would continue to be invoiced in the manner of the Parties' 2001 Agreement, and with the parties' course of dealing for nearly three years after the execution of the 2012 Agreement.

30. Thereafter, SleepMed and Pulse commenced a mediation in an effort to resolve the dispute between the Parties related to the 2014 Invoice. However, Pulse abandoned the mediation, thus leaving the dispute pending and unresolved.

### Pulse's Improper "Credit Hold" and Cessation of Services

31. On November 23, 2015, SleepMed received an email from Jaime Martinez, Accounting Assistant at Pulse, advising that Pulse had placed SleepMed "on Credit Hold due to non-payment on the account" relative to the 2014 Invoice.

32. When Ms. Martinez sent her email, SleepMed was current on all accounts payable to Pulse. Indeed, SleepMed has paid all of Pulse's monthly invoices through October 2015.

33. By putting SleepMed on "Credit Hold," Pulse has communicated its intention to stop providing software maintenance and support services to SleepMed for the licensed computer programs.

34. The 2012 Agreement requires Pulse to provide software maintenance and support services to SleepMed. *See* Exhibit B, Section 7.

35. More than one-half of the fees paid by SleepMed to Pulse each month are for ongoing software maintenance and support.

36. By letter dated December 3, 2015, SleepMed sought assurance from Pulse that it would continue to provide software maintenance and support, but Pulse did not respond as requested.

37. Pulse's intention to stop providing software maintenance and support services to SleepMed for the licensed computer programs will irreparably harm SleepMed in at least the following ways:

    a. SleepMed relies on PPPMP to generate cash-flow. Any interruption in cash-flow is not merely a financial harm, but essentially precludes SleepMed from operating its national business.

    b. Pulse's refusal to provide software maintenance and support services will interfere with SleepMed's ability to maintain and track patient information, and to share such information with patients' other medical providers. As such, it will (1) immediately and irreparably harm SleepMed's ability to operate as a national health care provider for patients; and (2) prevent SleepMed from sharing important information with medical providers.

38. By placing SleepMed on "Credit Hold" and threatening to withhold software maintenance and support services, Pulse is attempting in bad faith to cause business disruption, patient dissatisfaction, and financial distress, all to force SleepMed to acquiesce to Pulse's unjustified demand for millions of dollars over and above the fifteen years of payments already made by SleepMed to Pulse.

39. As a result of Pulse's breach of the 2012 Agreement, SleepMed will incur damages in an amount in excess of $75,000. The jurisdictional threshold amount is met by cumulating the value of the services at issue, the value of the injunction sought which includes

the value that would flow to SleepMed if the injunction is granted (*i.e.* its ability to continue its business), and the attorney's fees and treble damages sought under the Massachusetts Unfair Trade Practices Act.

## COUNT I

## BREACH OF CONTRACT

40. SleepMed incorporates each of the assertions contained in the above Paragraphs of the Complaint as if each was set forth herein.

41. The 2012 Agreement between Pulse and SleepMed requires Pulse to provide software maintenance and support services to SleepMed. *See* Exhibit B Section 7.

42. Pulse has indicated that it will cease providing software maintenance and support services to SleepMed without justification and in breach of the 2012 Agreement.

43. Unless enjoined, Pulse's improper cessation of services will also cause SleepMed immediate, irreparable damage.

44. Pulse's breach will result in monetary loss to SleepMed in excess of $75,000.

## COUNT II

## VIOLATION OF THE MASSACHUSETTS UNFAIR TRADE PRACTICES ACT, M.G.L. c. 93A, §§2 and 11

45. SleepMed incorporates each of the assertions contained in the above Paragraphs of the Complaint as if each was set forth herein.

46. SleepMed is a business engaged in trade or commerce.

47. Pulse is a business engaged in trade or commerce.

48. SleepMed and Pulse have been involved in a commercial relationship since 2001 based on arm-length commercial contracts for the use of healthcare-related practice management software.

49. Unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful and actionable under Massachusetts law. *See* M.G.L. c. 93A §2 and §11.

50. Stopping the provision of software maintenance and support services in violation of the 2012 Agreement constitutes unfair conduct. Pulse is clearly attempting in bad faith to cause business disruption, patient dissatisfaction, and financial distress in hopes of forcing SleepMed to acquiesce to Pulse's unjustified demand for millions of dollars which is an unbargained-for benefit to the detriment of SleepMed.

51. Pulse's unfair conduct is occurring primarily and substantially within Massachusetts because the center of gravity of the circumstances giving rise to the M.G.L. c. 93A §2 and §11 claim is primarily and substantially within Massachusetts. Most of the SleepMed employees who use the PPPMP are located in Peabody, Massachusetts, and the administrative and business functions that the PPPMP enables occur in Peabody, Massachusetts.

52. Pulse's unfair conduct will result in monetary loss to SleepMed in excess of $75,000, which will continue to increase unless and until Pulse's unfair conduct stops.

## **PRAYER FOR RELIEF**

WHEREFORE, SleepMed respectfully demands that judgment be entered in its favor and against Pulse as follows:

1. A temporary, preliminary and permanent injunction requiring Pulse to immediately resume provision of software maintenance and support services to SleepMed in accordance with the 2012 Agreement.

2. That relative to Count I, Pulse be required to pay damages to SleepMed for injuries in excess of $75,000 sustained by SleepMed as a result of Pulse's improper cessation of software maintenance and support services.

3. That relative to Count II, SleepMed be awarded double or treble damages and attorney's fees and costs under M.G.L. c. 93A §11.

4. That SleepMed be awarded such other and further relief as the Court may deem just and proper.

> PLAINTIFF,
> SLEEPMED INCORORATED,
>
> By its attorneys,
>
> /s/ Kate Moran Carter
> Kate Moran Carter (BBO #663202)
> Daniel P. Dain (BBO #632411)
> DAIN, TORPY, LE RAY, WIEST & GARNER, P.C.
> 745 Atlantic Avenue, 5th Floor
> Boston, MA  02111
> (617) 542-4800
> kcarter@daintorpy.com
> ddain@daintorpy.com
>
>
> OF COUNSEL:
>
> **BUCHANAN INGERSOLL & ROONEY PC**
>
> David Porter (PA ID # 66125)
> Erin Lucas Hamilton (PA ID #93852)
> One Oxford Centre
> 301 Grant Street, 20th Floor
> Pittsburgh, PA  15219
> david.porter@bipc.com
> erin.hamilton@bipc.com
> Telephone: (412) 562-8800
> Fax: (412) 562-1041
>
> DATED: December 8, 2015

## VERIFICATION

I, Joseph A. Rose, Vice President of Finance and Operations, am authorized to execute this Verification on behalf of SleepMed Incorporated. I have read the foregoing Verified Complaint and I believe it to be true and correct to the best of my knowledge, information, and belief.

This Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

/s/ Joseph A. Rose
Joseph A. Rose

Dated:  December 8, 2015